[No. AO18776. First Dist., Div. One. Aug. 11, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
JEFFERSON D. WALKER, Defendant and Appellant.

888

COUNSEL

Scott Lueders, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Ronald E. Niver and Herbert F. Wilkinson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ELKINGTON, Acting P. J.—Defendant Jefferson D. Walker was convicted upon a jury's verdicts of the first degree murder (Pen. Code, § 187) of his wife, Susie, and of soliciting the murder (Pen. Code, § 653f) of one Tommy Olsen, a prospective witness against him at his murder trial. His appeal is from the judgment entered upon the jury's verdicts.

We affirm the judgment for reasons as will hereinafter be stated.

No contention is made that the evidence placed before the jury was insufficient support for their guilty verdicts.

We set forth the trial's evidence as it appears to be reasonably recited in Walker's appellate briefs.

"In the early morning hours of June 7, 1981 officers Seymour, Scott, and Weakland of the Livermore Police Department received a dispatch call to go to 341 Helen Way in Livermore. When they arrived, appellant Jeff Walker met them at the front door and directed them to the master bedroom where his wife was injured and in need of medical attention. The officers went to the master bedroom where they found appellant's wife, Susie Walker, lying on the bed with massive head injuries. Susie Walker was taken to the hospital by ambulance, underwent surgery, and was placed in the critical care unit in a coma. She remained unconscious for eight days and died on June 15, 1981.

"Dr. Thomas Rogers, a forensic pathologist, performed an autopsy the following day. The autopsy showed a large number of injuries to the victim's head, body and limbs. In his opinion, the cause of death was multiple blunt injuries to the head and neck caused by a blunt object. The injuries caused a swelling of the brain that in turn caused other bodily functions to cease.

"After Susie Walker had been taken to the hospital by ambulance, Jeff Walker spoke with Officer Seymour of the Livermore Police Department. He told the officer that he had returned to their house with his wife and in-laws around 10:00 that night. He and his wife had gone to bed approximately 11:00. Approximately one hour later, he heard the stereo go off, and got up out of bed to investigate. He stated that when he got to the entrance way between the family room and living room, he was struck over the head two or three times but did not see who did it. When he woke up, he went to use the phone in the kitchen and found that the cord had been pulled from the receiver. He went into the bedroom and turned on the light to use the phone there and found his wife in bed in the condition that the officers found her in. Officer Seymour further testified that a window in the kitchen had been broken in.

"Evidence Technician Gregory found that portions of the Walker's stereo system had been disturbed, that glass fragments from the broken window were found in the interior of the house, indicating that the window had been broken in from the outside, and that a small white plastic bindle was found on the floor of the living room, directly underneath a portion of the stereo. Crime Lab Technician Dorothea Bernard performed an analysis of the contents in the bindle and testified that the white powder contained methamphetamine. The scene of the household as found by the Livermore police

officers, and the injuries suffered by the victim Susie Walker, appeared to be connected with the burglary of the Walker residence.

"After continuous investigation by the Livermore Police Department, defendant/appellant was arrested for the murder of his wife in August 1981. While he was being held at Santa Rita between August 24 and 26, he had conversations with his cellmate, Mr. Charles Bell. According to Mr. Bell's testimony at the preliminary hearing, defendant/appellant solicited Mr. Bell to murder a potential witness against defendant, a Mr. Tommy Lee Olsen. Defendant/appellant was released from Santa Rita approximately August 26 and was not charged with any crimes, apparently due to insufficient evidence and a hearsay problem. Defendant/appellant retained his trial attorney on the same date that he was arrested. On that date, defendant's counsel contacted a member of the district attorney's office as well as the investigating members of the Livermore Police Department to inform them of his representation of Walker.

"After Walker was released from Santa Rita without being charged, he returned to the jail to visit Mr. Bell. According to Mr. Bell, they discussed the agreement for Bell to murder witness Olsen. Two days after that visit, defendant/appellant once again visited Bell at Santa Rita and again briefly discussed the deal. However, prior to this visit, Bell contacted police authorities and informed them about Mr. Walker's solicitation of him for murder. It was then arranged that Bell would telephone defendant/appellant at his home and that the conversation would be tape recorded with the consent of Bell and unknown to Walker. The contents of that tape recording, and Bell's testimony from the preliminary hearing was the sole evidence against defendant/appellant regarding the charge against defendant/appellant that he solicited Bell to commit the crime of murder. Although Bell had never been asked to inform on cellmates or other prisoners before, after he was seen visiting with Mr. Walker after Mr. Walker's release, he was approached by authorities that if he had any information to tell the police about Walker, he should go ahead and tell them. Bell was promised by the authorities, at their suggestion, that if he was later convicted on the crime for which he was being held, they would do all they could to have him serve the time outside of the State of California due to Bell's falsely wearing a 'snitch jacket.' Despite that label, Bell insisted that he had never informed on anyone before.

"Charles Bell refused to testify at the trial of defendant/appellant. He refused to make any comment as to why he would not do so. The court demanded that he testify, but Bell refused even after immunity was given him. The court initially indicated that it would hold Bell in contempt but later admitted that such sanction was not much of an inducement for him to

testify since he was facing a possible 60 years in prison for pending criminal accusations.

"During the early part of 1982, after the informations had been filed against defendant/appellant and while he was in custody, he began initiating telephone conversations with one of Susie Walker's sisters, Sherrill Anderson. At that time, defendant/appellant was involved in preparation of his defense with his trial counsel since trial was approximately one month away. On March 5, 1982, Ms. Anderson contacted the deputy district attorney who was trying the case and informed him that she had purchased equipment for the taping of the phone conversations with Walker. The deputy district attorney authorized her to tape such phone conversations with defendant/appellant. During two taped phone conversations with Ms. Anderson, defendant/appellant discussed in detail his state of mind at the time of the offense. Walker apparently also discussed with Anderson the details of his defense theories and strategy and trial tactics. According to defendant/appellant's trial counsel, the fact that the prosecution learned this information severely impacted the attorney/client relationship and may have affected his trial strategy and defense theories. The trial court suppressed the two tapes but refused to grant the other two sanctions requested by defense counsel that the case be dismissed or that the prosecution prove beyond a reasonable doubt that his evidence did not directly or indirectly come from what was learned from these tapes.

"At trial, the prosecution put on numerous witnesses, including Tommy Lee Olsen, a close friend of Walker's. Olsen testified that on numerous occasions during the weeks preceding the attack on the victim, defendant/appellant discussed with him his plans and desire to do away with his wife. Olsen further testified that he went to defendant/appellant's house on the evening of the attack, helped Walker make the residence look like the scene of a burglary by carrying away valuable property and leaving a bag of methamphetamine on the floor, and that he hit or struck defendant/appellant several times on the head and chest.

"Defendant/appellant Walker testified at trial in his own behalf. He told the jury about his early childhood, including the death of his father in an industrial accident when he was five years old. He had a religious upbringing and training, and slept in the same room as his mother, who never remarried, until he was ten years old. He had met and married Susie Walker at a fairly early age and in fact had not had sexual relations with any other woman prior to his marriage. The great bulk of his testimony related to his relationship with his wife, in which it was indicated that he was compelled to give up dancing, hobbies, etc. due to the wishes of his wife. She controlled everything and was obsessed with her appearance and perfectionism.

He eventually reached the conclusion that all other options to end the relationship were unworkable and it was either suicide or murder. He admitted administering the severe beating of his wife with a heavy lead fishing weight, and testified to his state of mind as being that of intense anger at the time of the commission of the crime. The gist of defendant/appellant's testimony as well as that of the other defense witnesses was to the effect that Walker was an emotionally battered husband and that his mind formulated the thought that his only option to end the repressive situation he found himself in was murder. In his final argument, defense counsel argued the existence of the emotionally battered psychological state of mind of defendant/appellant and that Walker did not and could not have deliberated the act of murder at the time that it was committed. Defense counsel asked the jury to return with a verdict of murder in the second degree.

"The jury was instructed and sent out to deliberate on the morning of May 3, 1982. On the following day, the jury returned to the courtroom with a request to rehear the transcript of the preliminary hearing of witness Charles Bell as well as the tape recording made of the conversation of Bell and Walker. The jury returned less than one hour later with a verdict of guilty of murder in the first degree with infliction of great bodily injury and a verdict of guilty to the charge of solicitation of another to commit murder."

We state the several contentions of Walker's appellate briefs as asserted, and as phrased, by him.

I. *Contention*: "Witness Charles Bell was not legally unavailable and his prior testimony should not have been read to the jury."

As noted, one Tommy Lee Olsen was a prospective witness against Walker at the latter's trial for murder. Witness Charles Bell at Walker's preliminary examination had testified to Walker's solicitation of him, during his jail confinement, to murder Tommy Lee Olsen. The witness was there available for cross-examination by Walker, *and was so cross-examined.* By the time of Walker's trial the witness was himself facing charges of several felonies. Called by the People for his testimony at Walker's trial the witness, saying "I don't want to take the stand," steadfastly refused to answer any questions. Asked if he would testify if granted immunity, he answered, "No," and "I'm not going to testify, your Honor . . . , I'm not testifying." Threatened by the court with contempt, he stated that he would nevertheless not testify. And when the court asked why he would not "answer those questions," the response was: "I don't have no comments on that, your Honor." The trial court then recognized that the witness was facing "somewhere around 60 years of incarceration," and that confining him until he

agreed to testify would be unproductive and idle. The court then *ordered* the witness to testify. He again said he would *not*, and he did *not*.

■ The trial court thereupon declared Bell to be *"unavailable"* as a witness, and permitted the People to place in evidence his direct examination, *and cross-examination,* at Walker's preliminary examination. That ruling is the subject of the instant contention of error.

Evidence Code section 1291 states: "(a) Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: . . . (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."

*Mason* v. *United States* (10th Cir. 1969) 408 F.2d 903, presented factual circumstances similar to those at bench. And there also, the defendant complained of a denial of his constitutional right to confrontation by witnesses against him. The reviewing court stated (p. 906): "We consider, as did the trial court, that the important element is whether the *testimony* of the witness is sought and is available and not whether the witness' body is available. . . . The record here shows that the trial judge did all that was reasonable and proper to have the witnesses testify. . . . We hold that the trial judge was not in error in permitting the use of the witnesses' testimony at the prior trial under the circumstances and in the manner he did."

And in *People* v. *Sul* (1981) 122 Cal.App.3d 355, 364-365 [175 Cal.Rptr. 893], where comparable factual circumstances obtained, the court stated: "We adopt the *Mason* standard of permitting former testimony of a witness who is physically available but who refuses to testify (without making a claim of privilege) if the court makes a finding of unavailability only after taking reasonable steps to induce the witness to testify unless it is obvious that such steps would be unavailing. Such action is required, else the defendant is denied his Sixth Amendment right to confrontation."

The holdings of *Mason* and *Sul,* we opine, are reasonable, and we adhere to them. Doing so, we think it manifest that the trial court of the case before us took reasonable steps to induce the witness to testify, but found them unavailing. There was no error.

II. *Contention*: "The tape recording of the phone conversation between defendant/appellant and Charles Bell was the fruit of a violation of the VI Amendment right to counsel and should have been suppressed."

Following Walker's initial arrest, Charles Bell, the subject witness of part I, above, contacted police officers and told them of Walker's solicitation of the murder of Tommy Lee. Known to the police, Walker had retained counsel to represent him in the murder charge, and upon its investigation. As here stated by Walker, "with the aid of the police authorities Bell placed a phone call to defendant/appellant during which incriminating statements regarding the solicitation charge were made. That phone call was tape recorded by the police officers without the knowledge of defendant/appellant," or of his attorney.

Relying on *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199], Walker contends that he was thus unconstitutionally denied his right to "effective representation by counsel at the only stage when legal aid and advice would help him."

He improperly places his reliance upon *Massiah*. There Massiah was presently charged with a criminal offense and was represented by counsel *in that case*. Nevertheless, seeking incriminating admissions, police officers successfully arranged with an underworld agent to engage in such conversations with Massiah, which were relayed by radio to listening or recording officers. The high court ruled the incriminating conversations inadmissible as evidence.

In the case at hand, unlike *Massiah*, Walker was engaging in a new and different crime as to which he was *not* represented by counsel. The police were reasonably permitted to investigate that ongoing crime in any lawful manner, without disclosing to its perpetrator that they were doing so, or without desisting therefrom because he was represented by an attorney on another criminal charge. And we note that but for the claimed *Massiah* error, no contention is made of unlawful police activity in the premises. The claimed error is nonexistent.

III. *Contention*: "The authorization for the victim's sister to tape record phone conversations with defendant/appellant required dismissal or at least a burden on the prosecution to show that their case was not derived from those tape recordings."

At a time when Walker was in jail custody charged with the murder of his wife and represented by counsel on that charge, the homicide victim's sister telephoned the prosecutor. At Walker's trial the following stipulation was reached.

"The facts would be that I received a telephone call on March 5 from Miss Anderson indicating to me that she had purchased the equipment for

the taping of phone conversations herself at her own—upon her own idea, not by any idea of mine and that she had a recorder and the tape and all that. And she wanted to know about the legalities of taping phone conversations.

"And I told her I would check on it. And I then told her that it would not be lawful for her to tape a phone conversation unless I authorized her to do so pursuant to the investigation. And I told her that I would authorize her to do so.

"However, I would not tell her or ask her to ask anything or say anything or in any way change the course of these conversations which were ongoing, which had been going on before this and continued after this.

"These conversations were phone calls made by the defendant to her at her home. They have been going on for months beforehand. And I told her that as far as I was concerned, the only thing I was authorizing was conversations that would normally take place and would take place in any event, could be memorialized on tape.

"And I was not asking her or telling her to ask anything or elicit any information or do anything different than she had been doing in the previous phone conversations, but I did authorize her to record those conversations as of March 5.

"The Court: You're drawing the stipulation that on March 5, 1982, you authorized her to record those phone conversations from Mr. Walker?

"Mr. Brown: Yes.

"The Court: All right." (In his advice to the victim's sister the prosecutor was apparently relying upon Pen. Code, § 633, q.v.)

Asked for a ruling on the recorded evidence's admissibility, the trial court ordered it suppressed on *Massiah* (see part II, above) grounds. But Walker's motion for the additional sanction of the action's dismissal was denied. ■ It is the latter of the trial court's rulings that is here charged as error.

Walker's reliance is principally on *Barber* v. *Municipal Court* (1979) 24 Cal.3d 742, 747-750 [157 Cal.Rptr. 658, 598 P.2d 818], where a police agent posing as one of several charged defendants attended confidential attorney-client strategy sessions of the case. (Here, *unlike Barber,* there was no prosecutorial eavesdropping upon confidential attorney-client communications, or direct or apparent violations of the right to counsel.) The *Barber*

court found the *Massiah* intrusion to be so blatant as to demand dismissal of the prosecution. But in his concurring and dissenting opinion, Justice Manuel, in a conclusion concerning which the majority expressed no contrary opinion, stated (p. 760): "Immunization of an accused from prosecution is an extraordinary remedy and has been reserved for the few cases where the state by its conduct has completely disabled itself in its ability to provide a fair trial."

And here, it will be noted, the recorded telephone calls were *made by Walker* to the sister of the murder victim; no contention is made that they in any way actually invaded the attorney-client relationship. Indeed Walker's trial attorney, apparently from his audition of the recordings, argued only that "it goes into his state of mind at the time of the offense," a matter having little if anything to do with the attorney-client relationship of the case.

We conclude that suppression of the recorded conversation was a legally sufficient sanction.

IV. ■ *Contention*: "The trial court's failure to give defendant/appellant's requested *Sears* instruction to the jury was prejudicial error."

Walker, purporting to rely upon *People v. Sears* (1970) 2 Cal.3d 180 [84 Cal.Rptr. 711, 465 P.2d 847], had unsuccessfully requested the following jury instruction:

"In considering whether or not the defendant is guilty of first or second degree murder and whether the prosecution has proven each and every element of the offense beyond a reasonable doubt, you should consider the following:

"1. The nature of the relationship between the defendant and his wife;

"2. How the defendant perceived the relationship;

"3. The options the defendant believed were available to him to end the relationship; and

"4. The personalities of Jeff and Susie Walker."

*Sears* teaches that an instruction "relating particular facts to any legal issue" is proper. (*People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 885 [123 Cal.Rptr. 119, 538 P.2d 247, 92 A.L.R.3d 845]; *People v. Sears, supra,* 2 Cal.3d 180, 190.)

Here, Walker had *admitted* that he had over a long period of time deliberated the murder of his wife, and had then brutally murdered her. Indeed (adding to his narration of the evidence), he had testified as follows:

"Q. You had previously considered getting a divorce?

"A. Yes.

"Q. And you previously considered leaving her?

"A. Yes.

"Q. And you previously considered suicide?

"A. Yes.

"Q. You rejected all those?

"A. When I—At the point when I decided it was suicide, I made the decision it was either her or me, and that I chose her, and after that I didn't look back.

"Q. You thought about it, and you decided one of us is going to die, and it's not going to be me?

"A. Yes, that's true.

"Q. And you decided that your life was more valuable than hers?

"A. I guess it was out of selfish motives, yes.

"Q. And you killed her for selfish motives?

"A. Yes.

"Q. You killed her because you wanted to live and that meant she had to die?

"A. Yes. . . . I wanted my freedom, yes. . . .

"Q. You wanted your freedom to do what?

"A. I just wanted to be able to do what I wanted to, whatever that might be, make my own decisions, buy my own clothes, have money in my pocket, go where I wanted to go when I wanted to go.

"Q. You decided that not only were you going to murder your wife but you were going to cover it?

"A. Yes. When I decided that I was going to do it, I had—I wanted to cover it.

"Q. You wanted to get away with it?

"A. Yes.

"Q. You didn't want to pay any price?

"A. Anybody that do something like that would want to get away. It's a natural condition.

"Q. That's not my question. You wanted to get away?

"A. Yes.

"Q. You didn't want to pay the price?

"A. No, I didn't.

"Q. You didn't want to accept responsibility for it?

"A. No, I didn't.

"Q. You decided to cover it up?

"A. Yes, I did.

"Q. You decided to make it look like a burglary?

"A. Yes, I did.

"Q. You decided to mislead and lie to everybody close to you, the entire community, and to the police?

"A. Yes, I did, including my church.

"Q. You decided to make it look like people that used dope did it; correct?

"A. Yes.

"Q. And you thought that would mislead the police?

"A. Yes.

"Q. And you considered how you were going to mislead the police, didn't you?

"A. I just put the—planted the dope there, and whatever they took off was theirs.

"Q. But you thought about how you were going to get away with this?

"A. I thought that would get me away with it, yes.

"Q. You thought that making it look like a burglary would help your getting away with it?

"A. Yes. I thought making it look like a burglary would help me get away.

"Q. You thought planting dope would help you get away?

"A. Yes. I thought that that would help or they'd be looking for somebody that used these. . . .

"Q. And you decided to gather up property to make it look like a burglar had taken property?

"A. After he got there, yes.

"Q. And you picked June 6, 1981, didn't you?

"A. Yes.

"Q. You planned that date in advance?

"A. Yes, I did."

We perceive no "*legal issues*" which related to Walker's requested instruction's "*particular facts*," such as "the personalities of Jeff and Susie Walker" and the "nature of" and "how he perceived" their marital relationship. And contrary to settled law, the so-called *Sears* instruction would have singled out Walker's testimony, charging the jury "how his evidence should be considered." (See *People* v. *Lyons* (1958) 50 Cal.2d 245, 271

[324 P.2d 556], disapproved on other grounds in *People* v. *Green* (1980) 27 Cal.3d 1, 32 [164 Cal.Rptr. 1, 609 P.2d 468]; *People* v. *Richardson* (1978) 83 Cal.App.3d 853, 865 [148 Cal.Rptr. 120], disapproved on other grounds in *People* v. *Saddler* (1979) 24 Cal.3d 671, 682 [156 Cal.Rptr. 871, 597 P.2d 130]; *People* v. *Smith* (1977) 67 Cal.App.3d 45, 47 [136 Cal.Rptr. 387]; *People* v. *Whittaker* (1974) 41 Cal.App.3d 303, 308 [115 Cal.Rptr. 845].)

Moreover we observe no defense, or evidence, of insanity, or of intoxication or mental illness or defect such as would amount to diminished capacity (see *People* v. *Cruz* (1980) 26 Cal.3d 233, 248 [162 Cal.Rptr. 1, 605 P.2d 830]). First degree deliberate and premeditated murder was thus conclusively established. The purported *Sears* instruction was therefore improper; it was addressed to no legal issue concerning which it may reasonably be said there was some evidentiary support. (See *People* v. *Preston* (1973) 9 Cal.3d 308, 319 [107 Cal.Rptr. 300, 508 P.2d 300].)

The judgment is affirmed.

Newsom, J., and Holmdahl, J., concurred.

A petition for a rehearing was denied September 8, 1983.