[Crim. No. 14166. Fourth Dist., Div. Three. Apr. 30, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
JACK B. FULTON, Defendant and Appellant.

**[Opinion certified for partial publication.†]**

†See footnote, *post,* page 93.

COUNSEL

Barbara Z. Baker, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Harley D. Mayfield, Michael D. Wellington and John W. Carney, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**CROSBY, Acting P. J.**—Vincent Carrano and Jack Fulton operated Swiss Vaults, a Santa Ana depository for precious metals, from which they embezzled the metals and attempted to cover up the theft by staging a robbery. They were found guilty of conspiracy to commit theft (Pen. Code, §§ 182, subd. 1, 484/487), conspiracy to submit a fraudulent insurance claim (Pen. Code, § 182, subd. 1 and Ins. Code, § 556), and submission of a fraudulent insurance claim (Ins. Code, § 556). As the loss exceeded $100,000, they also incurred an enhancement for a great taking (Pen. Code, § 12022.6). Carrano disappeared after posting bond on appeal, and his appeal has been dismissed.

I*

. . . . . . . . . . . . . . . . . . . .

---

*Sections I and III through IX do not meet the standards for publication, and they are ordered not to be published in the Official Reports (Cal. Rules of Court, rule 976.1).

## II

As Fulton does not attack the sufficiency of the evidence to connect him to the charged offenses, we only briefly summarize the facts. In April 1976 Carrano and Louis Emond purchased two businesses located at 1404 North Grand Avenue in Santa Ana, Swiss Vaults and Bullion Metals International (BMI), a trader in precious metals. Carrano and Fulton were president and vice president respectively of both companies, but Fulton was in charge of the daily operations. Swiss Vaults' customers stored silver and gold medallions, coins, and silver bars inside one of two vaults, in safety deposit boxes, sealed paint cans, or on the floor. Those who so desired received a 10 percent return on their deposits in exchange for allowing BMI to speculate with them.

As police later learned, Fulton and Carrano considered several schemes to cover up the embezzlement. In January 1977 they consulted Phillip Kitzer, an international con man, who suggested they sell Swiss Vaults and BMI to a European "buyer," a front for Kitzer and his associate, Jack Elliot, who would then abscond with the remaining assets. In July 1977 Fulton and Carrano adopted a simpler expedient; they fabricated a robbery to cover up the embezzlement without Kitzer's assistance.

Police were suspicious of Carrano's account of the robbery at the outset. And when a witness was located who saw three men working in Swiss Vaults at 11:40 p.m. the night before the robbery allegedly occurred, with a car backed up to the building, the truth began to emerge. A check with Swiss Vaults' alarm company revealed it had detected someone in the business at 8:27 that night, and Carrano responded to a telephone call from the company. The alarm computer showed the business closed at 8:39 p.m. and no entry until the next morning. The system could be defeated by taping certain contact points, however. Thus, someone familiar with the security system had deliberately concealed his presence in Swiss Vaults on the evening before the robbery.

Accounting records from Swiss Vaults and BMI were seized pursuant to a search warrant. They indicated BMI sold substantially more silver than it purchased. In particular, BMI's records for May and June 1977 showed a 79 percent gross profit. The prosecution argued the discrepancy between BMI's sales and purchases—and the reason for its astounding profits—was the sale of silver embezzled from Swiss Vaults.

### III-IX*

. . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante,* page 93.

## X

The major issue in Fulton's appeal arises from preindictment activities of Louis Emond, the co-owner/accomplice who turned prosecution informant. Before either defendant was formally accused and while the grand jury was investigating the Swiss Vaults matter, Emond acquired information concerning defense legal strategy from them. In light of *Barber* v. *Municipal Court* (1979) 24 Cal.3d 742 [157 Cal.Rptr. 658, 598 P.2d 818], we asked for and received extensive additional briefing on this alleged Sixth Amendment violation.

On August 24, 1977, the search warrant was served. The affidavit identified Carrano and Fulton as suspects in an alleged embezzlement. In September 1977 local news stories reported police would seek complaints against Carrano and Fulton, as well as Swiss Vaults' previous owner. On October 6, 1977, before any criminal charges were filed, Carrano and Fulton moved to quash the search warrant and for return of the seized records. On October 19, 1977, proceedings commenced before the grand jury with Carrano and Fulton as major targets. They were indicted on January 5, 1978.

Between October 19, 1977 and January 5, 1978, Carrano and Fulton were represented by one set of attorneys, while Emond retained his own. Emond thrice met with Carrano during this period armed with a secret transmitter monitored by the prosecutor. The initial meeting was not overheard because of an equipment malfunction,[2] but the second and third, which took place November 7, 1977, and December 5, 1977, respectively, were successfully monitored and recorded. Eventually, the tapes and transcripts of the two meetings were received by the grand jury and in a heavily expurgated form at trial.

It is unclear from the record if Emond was directed to attempt to learn defense legal strategy at the meetings. The prosecutor strongly denied it, and in early suppression hearings, so did Emond. By the time of trial, however, Emond had considerably softened his overall testimony concerning the defendants and was then able to recall that someone on the prosecution team once suggested he should inquire as to what "the defense was up to."

---

[2]There were other meetings, including several in the presence of a defense attorney, which were not electronically surveilled. There is no evidence Emond acquired anything at these meetings which was passed on to the prosecution or even that anything of importance was discussed, with one exception. Emond did report to the prosecution the defense attorney told him he was preparing a suppression motion. This was not news at the time, however.

Directed to or not, Emond definitely made inquiries concerning defense legal plans at the first recorded meeting, which took place at a Santa Ana coffee shop. Pertinent passages from the transcript appear in the margin.[3]

---

[3]"EMOND: Think he will? I don't think he will. You haven't told him everybody got summons yet, huh? You haven't been summoned yet? They're probably . . . what they're doing . . . they're just gonna get as many witnesses as they can and . . . before they summons you.

"CARRANO: We go to court on Monday, on the suppression motion.

"EMOND: . . . huh?

"CARRANO: So that just don't make sense, and the courts are closed on Friday.

"EMOND: Of this week?

"CARRANO: Yeah.

"EMOND: What for?

"CARRANO: Veteran's Day.

"EMOND: The courts have already celebrated Veteran's Day.

"CARRANO: No, that's what's goofy. The courts will be closed Thursday, and then Monday we go to court against em.

"EMOND: *What does your attorney say?*

"CARRANO: They can't understand it . . . that they'd even go before a Grand Jury before this suppression motion is heard.

"EMOND: Do you know what witnesses they served?

"CARRANO: Yeah, JOANNIE.

"EMOND: Uh huh.

"CARRANO: You.

"EMOND: Uh huh.

"CARRANO: ANAHEIM METALS.

"EMOND: Uh huh. (Pause.) All for the same day?

"CARRANO: Yep.

". . . . . . . . . . . . . . . . . .

"EMOND: Will you hand me that cream. I didn't even know . . . now, what happens to the Grand Jury? They have their newspapers here and everything, huh?

"CARRANO: Give me the pepper. No.

"EMOND: Who does the questioning?

"CARRANO: The D.A.

"EMOND: Oh, the D.A. does, not the Grand Jury themselves, huh? They just listen? Have you ever been before the Grand Jury before? You have been? When was that?

". . . . . . . . . . . . . . . . . .

"CARRANO: In his statement . . . said, that FULTON . . . and JOHNSON were stealing . . . and when confronted with that, he denied he said it.

"EMOND: Well, who confronted him, you or your attorneys or what?

"CARRANO: The attorneys . . . the JACK.

"EMOND: You mean, JACK FULTON?

"CARRANO: Yeah.

". . . . . . . . . . . . . . . . . .

"CARRANO: LEWIS, why didn't they go last week or the week before? It's some kind of a strategy plan, I feel. You see, because they know that we'll get em turned over. Maybe why they went to . . . day is to . . . is to . . .

"EMOND: VINCE, what makes you think you're gonna get it turned over?

"CARRANO: Well, we've got records now.

"EMOND: Now, yeah . . . but I mean, what makes you think that, uh . . . the courts gonna turn it over?

"CARRANO: Because of the law. They violated the law, there's no question of that. Cause Elvrum lied.

"EMOND: Uh huh . . . uh huh. *What does your attorney feel? What did they tell . . . what*

The second recorded meeting occurred at Swiss Vaults' premises, and Fulton was also present. Emond again sought information concerning defense legal strategy; highlights are set forth in the margin.[4]

---

*did they tell you?*

"CARRANO: That what they've done, the warrant . . . the warrant was overbroad, outward lying, the cop used supposition and not facts. Going in and getting the records without the . . . without the, uh . . . search warrant.

"EMOND: They . . . he had a search warrant, didn't he?

"CARRANO: Not for the Bank of Newport.

"EMOND: Oh, I didn't know about that. I thought it covered that too, didn't it?

"CARRANO: But, they went in without it.

"EMOND: You mean . . .

"CARRANO: They never had one issued on that.

"EMOND: Then, how come the bank let em have it?

"CARRANO: Precisely. *Then they went a month later and got it.*

"EMOND: Can you prove that? You can't.

"CARRANO: Because they issued a new search warrant a month after that one was issued.

"EMOND: You mean for the bank? (Pause.) *So, what's your . . . what's your strategy mean?*

"CARRANO: *Once that's overturned, that's it.*

"EMOND: What do you mean, that's it?

"CARRANO: They can't go . . . where they go?

"EMOND: They can't indict you now . . . they can't huh?

"CARRANO: And, if they do . . .

"EMOND: Or maybe they'll try to tell you indictment . . . not indict before . . . before the 14th.

"CARRANO: But, they have to get that turned over. You just file a motion to quash the indictment.

"EMOND: Well, that'd be the ideal thing.

"CARRANO: Huh?

"EMOND: That'd be the ideal thing. (Pause.)

" . . . . . . . . . . . . . . . . . . . . . . . . . . .

"EMOND: Uh huh. What do you think? I ought to squash [*sic*] it on the 14th, or earlier? I want to make a decision . . . I want to make a decision.

"CARRANO: No, it'll take four . . . three or four days to get it squashed [*sic*]. Next week, it'll be squashed [*sic*].

"EMOND: You really think so?

"CARRANO: Oh yea. Well, you read the papers, didn't you?

"EMOND: Yeah . . . yeah, but I didn't know the legal technicalities. *Your attorney should know, I mean you've got two of em.*

"CARRANO: *They say it'll be squashed . . . they say it'll be squashed* [*sic*].

"EMOND: Do you have confidence in those guys?

"CARRANO: They are good.

"EMOND: They are darn good, huh?

"CARRANO: Well, *you see they did a lot of research to work that out.*

"EMOND: Yeah. [Emphasis added.]"

[4] "CARRANO: I have to go to L.A.

"EMOND: You gotta go to L.A. *What does your attorney say?*

"CARRANO: They say that . . . . uh . . . uh . . . (pause) . . . they'll probably get an indictment, but their indictment is . . . uh . . . ph . . . uh . . . it's useless. One thing, there was a guy in here from Aetna Insurance in the latter part of April . . . who went in there and looked at everything.

"EMOND: Yeah, but you know he didn't go in there.

"CARRANO: How do I know?

■ The Attorney General first defends the prosecution's conduct on the basis that the Sixth Amendment right to counsel generally does not attach before the formal filing of criminal charges. (*Kirby* v. *Illinois* (1972) 406 U.S. 682, 688 [32 L.Ed.2d 411, 416, 92 S.Ct. 1877]; cf. *People* v. *Bustamante* (1981) 30 Cal.3d 88, 102 [177 Cal.Rptr. 576, 634 P.2d 927].)[5] He argues Fulton and Carrano had yet to be arrested, much less formally charged—although search warrants and subpoenas had been served, the grand jury impaneled, a motion to return seized property filed, and the defendants named as suspects in news reports. (*Hoffa* v. *United States* (1966) 385 U.S. 293 [17 L.Ed.2d 374, 87 S.Ct. 408]; *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199].) He also notes in *Barber* and subsequent decisions considering its potential application (see, e.g., *People* v. *Towler* (1982) 31 Cal.3d 105 [181 Cal.Rptr. 391, 641 P.2d 1253]; *People* v. *Poe* (1983) 145 Cal.App.3d 574 [193 Cal.Rptr.

"EMOND: Well, JACK said he didn't. Remember?
"CARRANO: Well, how . . . how . . . .
"EMOND: So you don't know, cause you wasn't there.
"CARRANO: I wasn't here. You weren't here.
"EMOND: Um huh.
" . . . . . . . . . . . . .
"CARRANO: I figure there's . . . uh . . . a pretty special . . . I mean these guys . . . see, I don't fish in that pond. Unfortunately, we made . . . we made the police a little unhappy . . .
"EMOND: You made the police a little unhappy? How was that?
"FULTON: They fucked up.
"EMOND: Huh?
"FULTON: They fucked up.
"EMOND: How did they fuck up?
" . . . . . . . . . . . . . . .
"Oh . . . . committed perjury . . . on two occasions. One, the guy swore to tell the whole truth and he got in front of the judge and didn't tell him that DON ELVRUM [one of the affiants to the search warrant] was a crook. (cough) And he knew he was a crook.
"CARRANO: Whose is this? Whose is this? Yours?
"FULTON: I . . . I'm gonna take it.
Um . . . and then they . . . they said . . . one cop said he cut his right arm loose and the . . . crime lab said that he was torn loose. Now, maybe they're just made a mistake. (pause) You know . . . so now they're in a box.
" . . . . . . . . . . . . . . . . .
"CARRANO: Because . . . the closer they get to the twentieth, the better I like it.
"EMOND: Why is that?
"CARRANO: That's when we go to court.
"EMOND: . . . what
"CARRANO: If he doesn't have that indictment by the twentieth, we got em fucked.
"EMOND: Why's that?
"CARRANO: . . . . . . . . .
"EMOND: On the twentieth, you mean?
"CARRANO: Well knock out all the evidence . . . follow?
"EMOND: Yeah."

[5]The *Fifth* Amendment right to the presence of counsel before questioning obviously *does* precede filing of formal charges, but the Fifth Amendment is not involved here as defendants were not in custody during the conversations.

479]; *In re Pratt* (1980) 112 Cal.App.3d 795 [170 Cal.Rptr. 80]), the defendants were all under formal accusation. But we do not embrace this distinction. To do so would be to reward misconduct in the obtaining of the accusatorial pleading itself. Defendants' preindictment legal strategy was, in our view, protected by the Sixth Amendment.

However, defendants never moved for more than suppression of the tapes until midway through trial, although *Barber* appeared much earlier. In *People* v. *Towler, supra,* 31 Cal.3d 105, "Defendant maintain[ed] that because the trial . . . took place before the opinion in *Barber* was filed, his counsel should not be expected to have anticipated that decision's holding that dismissal is an available sanction for such an intrusion. [Citation.] Although dismissal was not an established sanction before *Barber,* the defendants in *Barber* itself did, of course, seek such a dismissal in the trial court before trial and pursued that issue to this court by a pretrial writ. If Towler believed that the district attorney's conduct had undermined or prejudiced his defense, he did not need *Barber* to suggest that a motion for dismissal was the logical move." (*Id.,* at pp. 121-122.)

Defendants here failed to seek dismissal—even post-*Barber*—until after the prosecution rested. ▊ Moreover, with all the potential prejudice readily visible, they were unable to convince the trial judge any prejudice sufficient to warrant dismissal existed. We concur with this conclusion.

The prejudice can be evaluated by simply examining the Emond transcripts; and having carefully done so, we have concluded the damage was minimal. The prosecution did learn bits and pieces of the defense strategy concerning the motion to traverse the search warrant, but that motion had already been filed. As the Attorney General correctly argues, the burden on a motion to suppress involving a search with a warrant is on the defense; and the defense did file exhaustive paperwork in support of the various motions to suppress, all disclosing what was overheard in the monitored conversations—and much more.

*Towler* explains, "[*Barber*] concluded that an exclusionary sanction would not adequately protect the defendants' rights, in part because in order to enforce that sanction the defendants would have been forced to divulge the full contents of conversations to which the police informant, but not the prosecutor, had been privy. [Citation.] Here, however, defendant would not have had to provide any information that the prosecutor did not already know because the confidential information was contained in a written document that the prosecutor had seized. Moreover, unlike the situation in *Barber,* here it might have been readily apparent from an examination of

the document whether or not the prosecution was actually aided by the information and whether some remedy short of dismissal would be adequate to protect defendant's rights. [Citation.]" (*People* v. *Towler, supra,* 31 Cal.3d at p. 122.) The same logic applies in this case; suppression is sufficient.

At trial the tapes were severely edited, and virtually nothing relating to defense legal strategy was heard by the jury. Thus, the offending portions were effectively suppressed. The grand jury heard unexpurgated versions, but error in the commitment procedure can only be reached postconviction if actual prejudice at trial can be shown. (*People* v. *Pompa-Ortiz* (1980) 27 Cal.3d 519 [165 Cal.Rptr. 851, 612 P.2d 941].) None is apparent to us on this record.

We do not wish to be understood as commending the prosecutor's actions with respect to the use of Emond. Although the investigation was ongoing and there was an understandable desire to recover the loot, we still find the prosecutor's tactics bordered on the unethical. He knew the defendants were represented by counsel, yet even after his wired agent very bluntly and repeatedly attempted to learn defense legal strategy in the first recorded meeting, the prosecutor evidently did not discourage a repetition of this conduct at the second meeting. (Cf., *People* v. *Walker* (1983) 145 Cal.App.3d 886, 896 [193 Cal.Rptr. 812], where the defendant initiated telephone contacts with the sister of the murder victim and discussed defense strategy and trial tactics.) The prosecutor then compounded the error by revealing the complete contents of each tape to the grand jury, legal strategy and all.

 Nevertheless, we find no violation of constitutional dimension and no legal error of sufficient magnitude to require reversal in the acquisition and use of the tapes.[6] Evidence of guilt was plain; and the tapes could have only been a small contribution, if any, to the result,

---

[6]Fulton also argues the taping violated Penal Code sections 631 and 632, but this is not so. Taping done with the consent of one party to a conversation when authorized by law enforcement officials is lawful. Section 633 of the Penal Code provides, "Nothing in Section 631 or 632 shall be construed as prohibiting the Attorney General, any district attorney, or any assistant, deputy, or investigator of the Attorney General or any district attorney, . . . from overhearing or recording any communication which they could lawfully overhear or record prior to the effective date of this chapter. [¶] Nothing in Section 631 or 632 shall be construed as rendering inadmissible any evidence obtained by the above-named persons by means of overhearing or recording any communication which they could lawfully overhear or record prior to the effective date of this chapter." The taping would have been lawful at that time and, consequently, still is. (*People* v. *Murphy* (1972) 8 Cal.3d 349, 358 [105 Cal.Rptr. 138, 503 P.2d 594], cert. den., *sub nom. Murphy* v. *California* (1973) 414 U.S. 833 [38 L.Ed.2d 68, 94 S.Ct. 173].)

even were we to conclude they should have been suppressed in their entirety.

## XI

■ Fulton next argues the judge erred in instructing per CALJIC Nos. 6.22 and 17.00. CALJIC No. 6.22 requires the jury to decide whether each defendant individually was a member of a charged conspiracy. CALJIC No. 17.00 advises the jury to separately decide each defendant's guilt or innocence. *People* v. *Fratianno* (1955) 132 Cal.App.2d 610, 629 [282 P.2d 1002] found it *permissible* to reject the defendant's request for CALJIC No. 17.00 in a conspiracy case—even though a substantive count was also charged—on the ground it "would have been misleading in a prosecution for conspiracy where the acts of any defendant during and pursuant to the conspiracy are binding on all." (*Id.*, at p. 629.) In 29 years the case has yet to be cited for that proposition to our knowledge, except by CALJIC, and we believe *Fratianno*'s logic is questionable on the point. The jury *should* consider guilt or innocence of each defendant separately in conspiracy cases as in all others; but this does not mean, as *Fratianno* implies, it should not first determine whether a conspiracy was proved based on all the evidence.

California courts have become more and more sensitive to the potential for unfairness inherent in a conspiracy charge, especially "[t]he psychological reality that in a trial against a number of conspirators, a weak case against one defendant will be strengthened by a mass of evidence relevant only to his codefendants." (*Castro* v. *Superior Court* (1970) 9 Cal.App.3d 675, 692 [88 Cal.Rptr. 500]; see also *People* v. *Donahue* (1975) 46 Cal.App.3d 832, 839 [120 Cal.Rptr. 489].) Although the instructions are cumulative to an extent, reading both might be some small help in avoiding the danger noted in. *Castro* and *Donohue*.

Moreover, substantive counts, in addition to the conspiracy charge, were alleged here. Even if CALJIC No. 17.00 is unnecessary in a pure conspiracy case, it should still be given *sua sponte* as to additional counts joined in a conspiracy prosecution.[7] (*People* v. *Crain* (1951) 102 Cal.App.2d 566, 581 [228 P.2d 307].) Since it would be potentially very confusing to advise the jury CALJIC No. 17.00 is inapplicable to conspiracy charges, the most practical solution is that adopted by the trial court here, give both without comment.

---

[7]*Fratianno* neglects to consider this point, although it too featured both conspiracy and substantive counts.

## XII

Finally, Fulton argues the court erred in imposing sentence under the "great taking" enhancement of section 12022.6 of the Penal Code, which provides, "Any person who takes, damages or destroys any property in the commission or attempted commission of a felony, with the intent to cause such taking, damage or destruction, and the loss exceeds: [¶] (a) Twenty-five thousand dollars ($25,000), the court shall in addition and consecutive to the punishment prescribed for the felony or attempted felony of which the defendant has been convicted impose an additional term of one year. [¶] (b) One hundred thousand dollars ($100,000), the court shall in addition and consecutive to the punishment prescribed for the felony or attempted felony of which the defendant has been convicted impose an additional term of two years. [¶] The additional terms provided in this section shall not be imposed unless the facts of the taking, damage, or destruction in excess of the amounts provided in this section are charged in the *accusatory pleading* and admitted or found to be *true* by the trier of fact." (Italics added.) Fulton relies on *People* v. *Reed* (1982) 135 Cal.App.3d 149 [185 Cal.Rptr. 169], which held a somewhat similarly structured enhancement for being armed during the course of certain sex offenses did not impose vicarious liability on an accomplice who was not personally armed. There are two problems with this position. First, we disagreed with *Reed* in *People* v. *Le* (1984) 154 Cal.App.3d 1 [200 Cal.Rptr. 839].

Second, as the Attorney General convincingly argues, the application of the *Reed* holding to the great taking enhancement would lead to absurd results. The criminal who masterminds the offense would be subject to less severe punishment than the minions who actually carry out the crime at his direction. The Legislature cannot have intended that anomaly, and it is obviously aware of means to restrict the scope of liability to defendants who personally commit an act forbidden by an enhancement. (See Pen. Code, §§ 12022, subd. (b), 12022.5 and 12022.7.) ▮ We conclude *all* persons who participate in an offense which results in a great taking, with the requisite knowledge and intent, are subject to the terms of the enhancement, regardless of the specific amount personally taken.

Judgment affirmed.

Wallin, J., and Sonenshine, J., concurred.

A petition for a rehearing was denied May 15, 1984, and appellant's petition for a hearing by the Supreme Court was denied July 26, 1984. Bird, C. J., was of the opinion that the petition should be granted.