[No. H002620. Sixth Dist. Mar. 14, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL L. BENALLY, Defendant and Appellant.

902

**COUNSEL**

Manuel J. Baglanis, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, David D. Salmon and Peter Crook, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**AGLIANO, P. J.**—Defendant Michael Benally appeals from a judgment of conviction entered upon a jury verdict finding him guilty of battery with

serious bodily injury. (Pen. Code, §§ 242-243, subd. (d).)[1] The jury found him not guilty of two counts of forcible rape. (§ 261, subd. (2).) The trial court sentenced defendant to state prison for the upper term of four years.

Defendant makes the following contentions on appeal: (1) the police taping of a conversation between defendant's attorney and the attorney's investigator violated his right to counsel under the federal and state constitutions; (2) the trial court erroneously failed to suppress defendant's statements obtained in violation of *Miranda*;[2] and (3) the trial court erred in instructing the jury it could convict defendant of the lesser offense of misdemeanor battery only if it first unanimously determined that he had not committed the greater offense of battery with serious bodily harm. For the reasons discussed below, the judgment of conviction is affirmed.

### Statement of Facts

On March 9, 1986, when Cathy K. arrived at the Pastime Bar in Sunnyvale, she saw defendant who was playing pool with one of her friends. Defendant eventually bought her a drink and asked if she wanted some cocaine. She did, and they walked to defendant's room in the Sunnyvale Hotel, located around the block. En route to defendant's room they bought beer at a liquor store.[3]

Once they were in defendant's room, defendant left to try to obtain some cocaine. He returned without any cocaine, but stated he would try again later. According to Ms. K., she decided at that point to return to the bar, however, defendant blocked her exit. He struck her repeatedly in the stomach and face. Ms. K. testified that defendant then forced her to have intercourse with him. As she left his room, she was bleeding. Ms. K. remembered telling someone that she had been raped and to call the police.

Mimi Nichols was returning to her office located near the Sunnyvale Hotel that evening. She observed Ms. K. staggering and moaning in distress. Ms. K.'s face was swollen and she had difficulty talking. Ms. Nichols took her to her office and called the police.

Officer Lesley Richards arrived on the scene in response to the reported rape. Ms. K.'s lip was cut, her face was red and swollen and she was almost hysterical. While Officer Richards was interviewing Ms. K., Officer William

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

[3] The parties stipulated at trial that defendant's blood-alcohol level was .17 percent at 10:15 p.m. and Ms. K.'s was .13 at 11:45 p.m. Ms. K. also tested positive for cocaine.

Davis arrived and the investigation was turned over to him. She told Officer Davis that she had been beaten and raped twice at the Sunnyvale Hotel.

Officer Tim Davis went to the Sunnyvale Hotel in response to the report of a rape by a suspect named "Mike." After the hotel manager stated "Mike" lived in room 16, Officer Davis and Lieutenant Hugh knocked on the door of room 16 several times and announced their presence. When they received no response, Officer Davis obtained a passkey from the manager, unlocked the door, and again announced that he was a police officer before he entered the room with his gun drawn. He did not know if Lieutenant Hugh's gun was also drawn. Davis saw defendant lying in bed covered by a blanket. He ordered defendant to raise his hands and get out of bed. The officer then checked the bed for weapons. As soon as he was assured of his safety, Officer Davis holstered his gun.

Officer Davis asked defendant to identify himself and allowed defendant to look for his wallet. Defendant was unable to locate his wallet but the officer confirmed his identity by running a driver's license check through radio communications. Officer Davis then asked defendant a series of questions pertaining to the rape under investigation. He did not advise defendant of his *Miranda* rights prior to any questioning. In response to the officer's questions, defendant stated a girl named "Cathy" had been in his room that evening and that he had met her in the Pastime Bar. He said that he was unable to give her the drugs that she wanted and she left. He denied having sex with her.

Defendant then pointed out a pill vial and cosmetic case and told the officer that they belonged to Cathy. The officer also saw a makeup mirror and razor blade on the dresser. When Officer Davis told defendant that he had been accused of rape, defendant denied the charge.

Unaware that Officer Tim Davis had already located the suspect, Officer William Davis brought Ms. K. to the hotel. Learning of Ms. K.'s arrival, Officer Tim Davis asked defendant to step into the hallway. Ms. K. identified defendant as her attacker and he was placed under arrest.

There was a white residue on both the makeup mirror and razor blade. The residue on the razor blade was identified as cocaine, however the residue on the mirror was of insufficient quantity to test. Blood on defendant's hand was the same type as Ms. K.'s.

Detective David Bridges interviewed Ms. K. that evening. She told him that she had left the bar with defendant to get some marijuana. Later, on the day of the preliminary hearing, she told him that she left the bar to get

cocaine. She explained that she did not provide this information earlier because she was afraid of being prosecuted for cocaine possession.

*The Defense*

Defendant testified that he was playing pool at the Pastime Bar when Ms. K. arrived. Eventually defendant bought everyone, including Ms. K., a drink. Defendant and Ms. K. began talking and he indicated that he could obtain some cocaine for her, however, he did not have his contact's telephone number with him. Since Ms. K. wanted him to go to his room to get the number, they then left the bar.

On the way to his room, they stopped at a liquor store. After arriving at defendant's room, defendant turned on the television for Ms. K. and then left to locate the cocaine. When he returned, defendant told Ms. K. that he was unable to reach his contact, but that he would try again in 15 to 20 minutes. Ms. K. agreed to wait and they began to play cards. They played strip poker and eventually they engaged in intercourse.

After about an hour, defendant left the room to call his contact, but again he received no answer. When he returned, Ms. K. was dressing. He told her what had happened and she demanded to know what he had done with her cocaine. She threatened him he was going to get it if he did not bring her cocaine. She then picked up her purse, pulled out a pair of scissors, and began waving them at defendant while demanding her cocaine. Defendant hit her three or four times on the left side of her face. She tried to kick him, but he finally got the scissors from her and told her to leave. He put the scissors in her purse. Ms. K. was hysterical and threatened revenge. After she left, defendant went to bed. He did not respond to the knock on his door, because he thought it might be some of her friends from the bar.

*Discussion*

I. *Police Taping of Defense Counsel's Conversation*

Defendant contends the charges against him should be dismissed because the police overheard and recorded a conversation between his attorney and his attorney's investigator at the Sunnyvale Department of Public Safety in violation of his constitutional right to counsel.

In June 1986 Thomas Mueller, defendant's trial attorney, and Brian Vierra, Mueller's investigator, met twice with Detective David Bridges at the Sunnyvale Department of Public Safety to view the evidence in the instant case. On one of these occasions, Detective Bridges left Mueller and

Vierra alone in a room used for police interviews. After Bridges left the room, he walked past the detective equipment room where he heard voices. The room contained a monitoring system for a number of listening devices installed in several rooms in the building. Bridges entered the room to discover that the conversation being recorded was that of Mueller and Vierra. After listening to the conversation for 30 seconds to a minute, Bridges testified he shut off the tape, although there is no break in the tape to corroborate Bridges's testimony.

Detective Bridges did not know who turned on the recording equipment. He thought another officer had probably heard the conversation in the interview room and put on a tape. Officers frequently helped each other by checking the recording equipment as they passed to ensure that a tape had not been forgotten.

Detective Bridges heard Mr. Mueller outline the general facts of the case, that is, that it was a rape case where the people had met in a bar and gone to a hotel room. He denied hearing any discussion about possible defenses.

Detective Bridges gave the tape to Mr. Camacho, the deputy district attorney initially assigned to the case. Bridges told Camacho that the portion of the conversation he heard involved Mueller's description of Camacho. Bridges did not talk to anyone else from the district attorney's office about the tape.

According to Mr. Camacho, Detective Bridges told him only about that portion of the tape involving Mueller's description of himself, Mr. Camacho. Camacho took custody of the tape, but did not listen to it. He believed Detective Bridges had inadvertently made the tape. He never informed Mueller or Vierra about the recording nor did he discuss the tape with Mr. Titus, the deputy district attorney who eventually tried the instant case. In July 1986, Mr. Camacho left the district attorney's office. Before leaving, he gave the tape to Julie Martinez, a secretary at the district attorney's office, with instructions to destroy it. She never did so.

Deputy District Attorney Lane Liroff was assigned to the case after Mr. Camacho left. On October 1, 1986, Detective Bridges told him about the tape and Liroff informed Mr. Mueller the following day. At that time, Liroff thought the tape had been destroyed. He subsequently learned from Ms. Martinez that the tape had not been destroyed. Mr. Liroff did not listen to the tape. However, Detective Bridges made a reference to him about sadomasochism, and Liroff inferred this might be a possible defense.

Defendant brought a motion to dismiss based on the impropriety of the taping. At the conclusion of the hearing on the motion, the court and

defense counsel listened to the tape in camera. After hearing the tape, the court ordered that the tape be sealed pending further court order. The trial court denied the motion to dismiss. It found that neither Mr. Camacho, Mr. Liroff nor anyone in the district attorney's office ever listened to the tape. It also found that the only information from the tape which the deputy district attorneys received concerned Mr. Mueller's observations about Mr. Camacho. Thus, the trial court concluded the prosecution had not gained an unfair advantage.

The trial court also noted that the tape appeared to conflict with Detective Bridges's testimony regarding how the tape may have been made. However, the court was not willing to find that Bridges had intentionally taped the conversation. The court ordered Detective Bridges not to discuss the contents of the tape with anyone at the district attorney's office.

Later, the trial court directed defendant to request a hearing if he believed, in the course of the trial, any question or evidence by the prosecution may have been inspired by the contents of the tape. At any such hearing the prosecutor would be required to make a showing that the information was derived from an independent source. Defendant never requested a hearing on this issue.

On November 5, 1987, the prosecutor and defense counsel entered into a stipulation concerning the contents of the tape. The taping occurred after the preliminary examination, either on June 12 or 26, 1986.

The contents of the tape may be summarized as follows: the conversation between Mueller and Vierra began with a comment about Mr. Camacho. During the next minute and a half, Mueller discussed the inconsistencies in Ms. K.'s statements to the police. Mueller pointed out that she gave one story to the police at the scene and another story to the officers at the emergency room, however, at the preliminary hearing she returned to the first story. Vierra responded by noting that her most credible statement was the one at the emergency room where she was calmer and that her first statement was unreliable because she had been hysterical at the time. Vierra also stated that her emergency room statement made it appear that the intercourse was consensual. Mueller wondered why the prosecutor had not looked more closely at the evidence.

Mueller began discussing trial tactics. He mentioned withdrawing defendant's time waiver. He indicated which witnesses he wanted subpoenaed. For the next five minutes, Mueller discussed another case. Then Mueller began discussing Ms. K.'s injuries and gave his assessment that they weren't "that bad." He informed Vierra that defendant had told him that Ms. K.

pulled scissors out and Vierra commented that "it would be good for our guy . . . to get her to start talking."

Mueller assessed defendant's credibility on the witness stand. He then reviewed what had happened that night. Defendant and Ms. K. went to defendant's room, had sex and then Ms. K. insisted on cocaine. Both Mueller and Vierra concluded Ms. K. had sex in exchange for cocaine and when defendant did not furnish the cocaine, Ms. K. became angry and pulled her scissors out.

Mueller wondered whether the jury would believe that the beating was in self-defense. He stated that once Ms. K. admitted that she was lying about the first rape, then the second one should go out also. He also indicated the jury would probably have a problem with the aggravated battery.

The conversation then continued with a discussion of another case. After approximately four minutes, Detective Bridges entered the room. He informed Mueller and Vierra that the evidence was still at the crime lab. Detective Bridges and Camacho discussed other aspects of the case with Mueller and Vierra. The tape concluded after Detective Bridges returned to the room, "bagged" the evidence and had a brief conversation with another officer.

## A. The Right to Counsel Under the Federal Constitution

In *Weatherford* v. *Bursey* (1977) 429 U.S. 545 [51 L.Ed.2d 30, 97 S.Ct. 837], the Supreme Court held that infringement of a defendant's right to counsel does not require dismissal per se. In that case, an undercover agent, who had also been arrested and charged with the defendant, participated in meetings between the defendant and his counsel prior to trial. The court concluded that a showing of prejudice was essential to establish a claim that one's Sixth Amendment rights had been violated. The court further observed that "[h]ad Weatherford [the undercover agent] testified at Bursey's trial as to the conversation between Bursey and Wise [Bursey's attorney]; had any of the State's evidence originated in these conversations; had those overheard conversations been used in any other way to the substantial detriment of Bursey; or even had the prosecution learned from Weatherford, an undercover agent, the details of the Bursey-Wise conversations about trial preparations, Bursey would have a much stronger case." (*Id.* at p. 554 [51 L.Ed.2d at p. 39].)

In *United States* v. *Morrison* (1981) 449 U.S. 361 [66 L.Ed.2d 564, 101 S.Ct. 665], two government agents met with the defendant without the knowledge or permission of her counsel after she had been indicted. Assum-

ing a Sixth Amendment violation, the court observed that "[c]ases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." (*Id.* at p. 364 [66 L.Ed.2d at p. 568].) The court reaffirmed the need for a showing of prejudice. "More particularly, absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate. [Fn. omitted.] This has been the result reached where a Fifth Amendment violation has occurred [fn. omitted], and we have not suggested that searches and seizures contrary to the Fourth Amendment warrant dismissal of the indictment. The remedy in the criminal proceeding is limited to denying the prosecution the fruits of its transgression." (*Id.* at pp. 365-366 [66 L.Ed.2d at p. 569].)

In the instant case, as in *Weatherford,* Bridges did not testify at trial as to what he might have heard on the tape, none of the prosecution's evidence originated from information on the tape, there was no showing the taped conversations were used in any way to defendant's detriment, and the prosecuting attorney did not learn about defendant's trial preparations. Defendant argues there was no way for him to know how Detective Bridges prepared his testimony or that of other witnesses. Defendant, however, never questioned Bridges about whether listening to the tape influenced his own testimony or how he prepared other witnesses, if in fact, he prepared other witnesses. Accordingly, having shown no prejudice or threat thereof, dismissal was not warranted. The appropriate remedy, in our view, was that invoked by the trial court. Prior to trial, the court ordered that the tape be sealed and that Detective Bridges not discuss its contents. Further, the court later ordered that if defendant objected to any question or evidence the prosecution would be required to show that the information or evidence was derived from a source other than the tape. These procedures adequately ensured that defendant would not be prejudiced by the taping.

Defendant relies on *United States* v. *Levy* (3d Cir. 1978) 577 F.2d 200, in which the court held dismissal was appropriate without a showing of prejudice. However, as this court noted in *People* v. *Lowery* (1988) 200 Cal.App.3d 1207, 1227 [246 Cal.Rptr. 443], *Levy* preceded *Morrison.* Defendant also argues that the issue of who bears the burden of persuasion regarding prejudice or the lack thereof when the Sixth Amendment violation involves the transmission of confidential information to the government has not yet been resolved by the Supreme Court. (*Cutillo* v. *Cinelli* (1988) 485 U.S. 1037 [99 L.Ed.2d 915, 108 S.Ct. 1600].) He argues the burden should be on the People to rebut the presumption of prejudice. Our examination of the record of the hearing and the order made by the court subsequently at the time of trial, however, indicates the burden of proof here was

placed on the People. Thus, defendant has no basis on which to complain on appeal.

## B. *Right to Counsel Under the California Constitution*

In *Barber* v. *Municipal Court* (1979) 24 Cal.3d 742 [157 Cal.Rptr. 658, 598 P.2d 818], two undercover police officers participated in a demonstration at a nuclear power plant which resulted in the arrest of the participants. After the arrest, the officers remained undercover and participated in defense strategy meetings with defense counsel. At one point, one officer drew a map of the demonstration site, but omitted information which would have been helpful to the defense case. He also communicated on a regular basis with his superiors concerning information derived from the meetings. Prior to trial, the defendants discovered the presence of the undercover officers and moved to dismiss the charges. The Supreme Court held that the defendants' right to communicate privately with their counsel under California law had been violated by the presence of the undercover officers. Under the circumstances of that case, the court found the only effective remedy for the violation of the defendants' rights was dismissal of the charges. The court noted that the prosecutor's case had been aided because the defendants no longer felt they could freely and candidly discuss their case with their attorneys. (*Id.* at p. 756.) The court further held that the suppression of evidence which the prosecutor might have obtained from the meetings was an inadequate remedy and would not "deter the state from such unlawful intrusions in the future." (*Id.* at p. 756.)

Defendant argues that, as in *Barber,* he became distrustful of counsel as a result of the taping of the conversation, and therefore prejudice should be presumed. We disagree. Here the recording of defense counsel and the investigator was an isolated incident. Bridges revealed to the prosecutor only that defense counsel had made a comment about him. There was no attempt to influence defense strategies. Thus, while we do not condone in any way the officer's misconduct in this case, it is distinguishable from what occurred in *Barber.*

Cases subsequent to *Barber* have required a showing of prejudice or a substantial threat thereof, although they have acknowledged that dismissal per se may be appropriate under certain circumstances. (*People* v. *Tribble* (1987) 191 Cal.App.3d 1108, 1116-1118 [236 Cal.Rptr. 733]; *People* v. *Garewal* (1985) 173 Cal.App.3d 285, 292 [218 Cal.Rptr. 690]; *People* v. *Fullton* (1984) 155 Cal.App.3d 91, 99 [201 Cal.Rptr. 879]; cf. *Boulas* v. *Superior Court* (1986) 188 Cal.App.3d 422, 429-434 [233 Cal.Rptr. 487].) In *Garewal,* the court noted that "[w]hen a reviewing court is satisfied that no prejudice could have occurred, suppression is generally found to be an

adequate remedy, even where the violation of the defendant's Sixth Amendment rights was deliberate." (173 Cal.App.2d at p. 292.) As previously noted, the remedy here adequately ensured that defendant's rights were protected.

## II. *Failure to Give Miranda Warnings*

■ Defendant next contends he was subjected to a "custodial interrogation" in his hotel room and therefore his statements to the officers were inadmissible because the officers failed to give *Miranda* warnings.

An officer must give *Miranda* warnings before questioning where an individual "has been taken into custody *or* otherwise deprived of his freedom in any significant way or is led to believe, as a reasonable person, that he is so deprived." (*People v. Taylor* (1986) 178 Cal.App.3d 217, 225 [223 Cal.Rptr. 638], italics in original.) "Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." (*California v. Beheler* (1983) 463 U.S. 1121, 1125 [77 L.Ed.2d 1275, 1279, 103 S.Ct. 3517].)

In *Orozco v. Texas* (1969) 394 U.S. 324 [22 L.Ed.2d 311, 89 S.Ct. 1095], four police officers entered the defendant's room at 4 a.m. and began an interrogation without advising him of his *Miranda* rights. The defendant's incriminating statements were admitted at trial. The Supreme Court reversed.

Here the two officers unlocked defendant's door with a passkey, announced they were police officers, and then entered defendant's room. At least one officer, Davis, entered with his gun drawn. There the officers found defendant lying in his bed. Officer Davis ordered him to raise his hands and get out of bed. Once the officer checked the bed for weapons, he holstered his gun and began questioning defendant about the rape. A reasonable person, subjected to an interrogation under these circumstances, would believe that he had been deprived of his freedom in a significant way.

Since the error involves a federal constitutional right, it must be reviewed under the harmless-beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]. In his statements to the officers, defendant admitted that "Cathy" had been in his room and that she left because he did not have the drugs she wanted. These statements were consistent with his testimony at trial. Defendant also told the officers that he did not have sex with her. While this statement was inconsistent with his trial testimony, the jury acquitted him

of the two counts of rape. Further, the evidence against defendant on the battery with great bodily injury was strong. Several witnesses testified as to the nature of the victim's injuries. On this record, we find the erroneous admission of his statements was harmless beyond a reasonable doubt.

## III. *Jury Instructions*

■ Defendant contends the jury was erroneously instructed that it could convict defendant of the lesser offense of misdemeanor battery only if it first unanimously found that he had not committed the greater offense of battery with serious bodily injury.

Defendant was charged in one count with battery with serious bodily injury. The lesser included offense was misdemeanor battery. The trial court instructed the jury pursuant to CALJIC No 17.10: "If the jury is not satisfied beyond a reasonable doubt that the defendant is guilty of the offense charged and it unanimously so finds, it may convict him of any lesser offense if the jury is convinced beyond a reasonable doubt that he is guilty of such lesser offense. [¶] The offense of battery, a misdemeanor, is a lesser included offense charged in count three, which, of course, is battery with serious bodily injury." In instructing the jury on how to fill out the verdict forms, the trial court stated the following: "If you cannot come to a unanimous decision you would not go on to the so-called lesser charge, lesser included charge. The only time you will consider at all the second paragraph in count three is if you have come to the unanimous opinion that the defendant is not guilty of the more serious charge then you would go on to consider whether he is or is not guilty of the less serious charge which is included, which is a charge of misdemeanor battery. . . . [¶] And, remember, you are not to fill out that, and you would not fill it out if you could not come to a unanimous conclusion one way or the other. You would only consider the lesser charge if you have come to the unanimous opinion that he is not guilty of the more serious charge."

In *People* v. *Kurtzman* (1988) 46 Cal.3d 322, 325 [250 Cal.Rptr. 244, 758 P.2d 572], the Supreme Court held that the jury is properly restricted from returning a verdict on a lesser included offense before acquitting on the greater offense, but it is not precluded from considering lesser offenses during its deliberations. Here the trial court's comments that the jury could "consider" the lesser charge only after it had reached the unanimous opinion that he was not guilty of the greater offense was therefore error.

However, the error was harmless. During deliberations the jury sent a note to the court requesting further instruction on the law of battery. After the court gave the definition of battery, the court asked if the jury's question

had been answered. The foreperson replied: "Well, we were questioning the distinction between felony and misdemeanor in the battery law. We were a little confused." The court then read the definitions of misdemeanor battery and serious bodily injury. It is thus obvious the jury was not misled by the court's previous comments nor did it interpret CALJIC No. 17.10 to restrict the course of deliberations. It is not reasonably probable that absent the error a different result would have occurred. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; *People* v. *Kurtzman, supra,* 46 Cal.3d 322, 335.)

The judgment is affirmed.

Brauer, J., and Premo, J., concurred.

A petition for a rehearing was denied April 12, 1989, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied June 21, 1989.